*PRELIMINARY PRINT*

VOLUME 606 U. S. PART 1

PAGES 305–356

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 26, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## GUTIERREZ *v.* SAENZ ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 23–7809.   Argued February 24, 2025—Decided June 26, 2025

In 1998, Texas charged Ruben Gutierrez with capital murder for his involvement in the killing of Escolastica Harrison.   The State's theory at trial was that Gutierrez wielded one of the two screwdrivers used to stab Harrison to death in her mobile home.   The jury convicted Gutierrez of capital murder.   At the sentencing phase of Gutierrez's trial, the jury was required to answer whether Texas proved beyond a reasonable doubt that Gutierrez "actually caused" Harrison's death or, if not, that he "intended to kill [her]" or "anticipated that a human life would be taken."   Tex. Code Crim. Proc. Ann., Art. 37.071(2)(b)(2).   The jury answered yes, and Gutierrez was sentenced to death.

For nearly 15 years, Gutierrez has sought DNA testing of evidence he claims would prove he was not in Harrison's home the night of the murder.   Texas's Article 64 allows DNA testing where a "convicted person establishes by a preponderance of the evidence" that he "would not have been convicted if exculpatory results had been obtained through DNA testing," among other criteria.   Art. 64.03(a)(2).   Invoking Article 64, Gutierrez twice moved in state court for DNA testing of untested crime scene evidence.   The trial court denied his first request in 2010, and the Texas Court of Criminal Appeals (TCCA) affirmed.   The court reasoned that even if Gutierrez's DNA was not found on the tested items, that would not establish his innocence of capital murder because he would still be a party to the robbery that resulted in Harrison's death.   The court concluded that Gutierrez could not use Article 64 to show he was wrongly sentenced to death unless he could also establish his innocence of the underlying crime.   In 2019, Gutierrez again sought DNA testing, but Texas courts denied his motion.   On appeal, the TCCA reiterated that DNA testing was not available to show only death penalty ineligibility.

Gutierrez then filed suit in federal court under 42 U. S. C. § 1983 against Luis Saenz, the district attorney who has custody of the untested evidence.   Gutierrez argued that Texas's DNA testing procedures violated his liberty interests in utilizing state postconviction procedures.   The District Court agreed and granted declaratory relief, finding it fundamentally unfair that Texas gives prisoners the right to challenge their death sentence through habeas petitions but prevents them

from obtaining DNA testing to support those petitions unless they can establish innocence of the underlying crime. The Fifth Circuit vacated the District Court's judgment and held that Gutierrez lacked standing to bring his § 1983 suit, finding that his claimed injury was not redressable because a declaratory judgment would be unlikely to cause the prosecutor to "reverse course and allow testing." 93 F. 4th 267, 272.

*Held*: Gutierrez has standing to bring his § 1983 claim challenging Texas's postconviction DNA testing procedures under the Due Process Clause. Pp. 314–321.

(a) Individuals convicted of crimes in state court "have a liberty interest in demonstrating [their] innocence with new evidence under state law." *District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. 52, 68. For that reason, a state-created right to postconviction procedures can sometimes create rights to other procedures essential to realizing the state-created right. In *Skinner* v. *Switzer*, 562 U. S. 521, the Court held that a Texas prisoner could file a due process claim under § 1983 against a prosecutor where the prisoner alleged that the prosecutor's refusal to turn over evidence deprived him of his liberty interests in utilizing state procedures to obtain reversal of his conviction or to obtain a pardon or reduction of his sentence. The Court reasoned that, while the prisoner could not challenge in federal court the state court decisions denying his Article 64 motions, he could allege in a federal § 1983 action that Article 64 unconstitutionally prevented him from obtaining such testing.

The question of a state prisoner's standing to bring a due process claim against the custodian of his evidence was first addressed in *Reed* v. *Goertz*, 598 U. S. 230, where the Court confronted another challenge to Texas's postconviction DNA testing law. Reed alleged, among other things, that Article 64's chain-of-custody requirement was unconstitutional and effectively prevented many individuals from obtaining DNA testing. The Court held that Reed had standing to pursue declaratory relief. First, Reed adequately alleged an injury: denial of access to the requested evidence. Second, the state prosecutor caused Reed's injury by denying access to the evidence. Finally, if a federal court concluded that Texas's postconviction DNA testing procedures violate due process, the state prosecutor's justification for denying DNA testing would be eliminated, thereby removing the barrier between Reed and the requested testing. The same is true here. Like Reed, Gutierrez alleges that the local prosecutor's denial of his DNA testing request deprived him of his liberty interests in utilizing state procedures to obtain an acquittal or sentence reduction. As in *Reed*, the declaratory judgment Gutierrez seeks would redress that injury by changing the legal status

of the parties and eliminating the state prosecutor's allegedly unlawful justification for denying DNA testing.   Pp. 314–316.

(b) The Fifth Circuit recognized the clear parallels between this case and *Reed* but distinguished the cases, reasoning that the local prosecutor in this case was unlikely to allow testing even if a federal court declared that Texas may not deny DNA testing that would affect only the punishment stage.   Respondents, too, argue that Gutierrez lacks standing because the District Court's reason for declaring part of Article 64 unconstitutional was only one of several independent state-law grounds supporting the prosecutor's decision to deny access to the evidence.   But this attempt to distinguish *Reed* fails twice over.

First, to the extent the Fifth Circuit based its assessment of redressability on the declaratory judgment the District Court later issued, rather than Gutierrez's complaint, it turned the Article III standing inquiry on its head.   Gutierrez's standing does not depend on the relief the District Court ultimately granted on the merits.   The proper focus of the standing inquiry is the complaint, and Gutierrez's complaint challenges not just Article 64's limitation to actual innocence claims, but also the other barriers Article 64 erects between Gutierrez and DNA testing. Second, and more fundamentally, the Fifth Circuit erred in transforming the redressability inquiry into a guess about whether a favorable court decision will ultimately result in the prosecutor turning over the DNA evidence.   In *Reed*, the Court reasoned that, if a federal court concludes that Texas's postconviction DNA testing procedures violate due process, that court order would redress the injury by eliminating the state prosecutor's reliance on Article 64 as a reason for denying DNA testing.   The same is true here.   A declaratory judgment in Gutierrez's favor would redress his injury by removing the allegedly unconstitutional barrier Article 64 erected between Gutierrez and the requested testing.   The Court in *Reed* was unmoved by the prosecutor's assertion that a declaratory judgment would not change his ultimate decision to turn over the evidence.   The reason is simple: That a prosecutor might eventually find another reason to deny a prisoner's DNA testing request does not eliminate the prisoner's standing to argue that the cited reasons violated his rights under the Due Process Clause.   Pp. 316–320.

(c) Respondents also assert that this case is now moot because the state prosecutor refused Gutierrez's DNA testing request even after the District Court issued the declaratory judgment.   That claim fails, too. A procedural due process claim like Gutierrez's is not mooted by the defendant's mid-appeal promise that, regardless of the lawsuit's outcome, the ultimate result will remain the same.   Holding otherwise would allow defendants to manufacture mootness by ensuring that, no matter what procedures a court requires them to employ, the same sub-

stantive outcome will follow. Article III requires no such result. Pp. 320–321.

93 F. 4th 267, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KAGAN, KAVANAUGH, and JACKSON, JJ., joined, and in which BARRETT, J., joined as to all but Part II–B–2. BARRETT, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 321. THOMAS, J., filed a dissenting opinion, *post*, p. 322. ALITO, J., filed a dissenting opinion, in which THOMAS and GORSUCH, JJ., joined, *post*, p. 338.

*Anne Elizabeth Fisher* argued the cause for petitioner. With her on the briefs were *Lisa Evans Lewis*, *Joseph W. Luby*, and *Joanne M. Heisey.*

*William F. Cole*, Deputy Solicitor General of Texas, argued the cause for respondents. With him on the brief were *Ken Paxton*, Attorney General, *Aaron L. Nielson*, Solicitor General, *Brent Webster*, First Assistant Attorney General, *Cameron Fraser*, Assistant Solicitor General, and *Eric Abels* and *Jefferson D. Clendenin*, Assistant Attorneys General.*

JUSTICE SOTOMAYOR delivered the opinion of the Court.

For nearly 15 years, petitioner Ruben Gutierrez has sought DNA testing of evidence that, he says, will help him prove he was never at the scene of the murder he was convicted of committing. When the local prosecutor refused to test the evidence in his custody, Gutierrez filed suit under Rev. Stat. §1979, 42 U. S. C. §1983, arguing that Texas's pro-

_____

*\*Elizabeth B. Wydra* and *Brianne J. Gorod* filed a brief for the Constitutional Accountability Center as *amicus curiae* urging reversal.

A brief of *amici curiae* urging affirmance was filed for the State of Arkansas et al. by *Tim Griffin*, Attorney General of Arkansas, and *Dylan L. Jacobs*, Interim Solicitor General, and by the Attorneys General for their respective States as follows: *Steve Marshall* of Alabama, *Treg Taylor* of Alaska, *Theodore E. Rokita* of Indiana, *Brenna Bird* of Iowa, *Russell Coleman* of Kentucky, *Liz Murrill* of Louisiana, *Lynn Fitch* of Mississippi, *Michael T. Hilgers* of Nebraska, *Dave Yost* of Ohio, *Gentner Drummond* of Oklahoma, *Alan Wilson* of South Carolina, *Jonathan Skrmetti* of Tennessee, and *Derek Brown* of Utah.

cedures for obtaining DNA testing violated his rights under the Due Process Clause. The District Court agreed and granted a declaratory judgment to that effect.

The Fifth Circuit, however, held that Gutierrez lacked standing to bring his § 1983 suit, reasoning that, even if a federal court declared Texas's procedures unconstitutional, the local prosecutor would be unlikely to turn over the physical evidence for DNA testing. That holding contravenes *Reed* v. *Goertz*, 598 U. S. 230 (2023), where this Court decided on analogous facts that another Texas prisoner had standing to sue the local prosecutor who denied him access to DNA testing. *Id.*, at 234. Put simply, *Reed* held that a federal court order declaring "that Texas's post-conviction DNA testing procedures violate due process" would redress the prisoner's claimed injury by "eliminat[ing]" the state prosecutor's reliance on Article 64 as a reason for denying DNA testing. *Ibid.*; see Tex. Code Crim. Proc. Ann., Art. 64.01 (Vernon 2018). The same is true here and the Court therefore reverses.

I

A

In 1998, Texas charged Ruben Gutierrez with capital murder for the killing of Escolastica Harrison at her mobile home in Brownsville, Texas. The State's theory at trial was that Harrison had been stabbed to death with two different screwdrivers. To support its view that Gutierrez wielded one of the two screwdrivers in question, the State introduced a statement Gutierrez gave to the police, in which he acknowledged that he and two accomplices had planned to rob Harrison on the day she was killed and that he had been in Harrison's home while one of his accomplices stabbed her. The jury convicted Gutierrez of capital murder.

Texas law provides that a criminal defendant can be guilty of capital murder even where he was merely a party to a crime (such as robbery) that resulted in a person's death.

Tex. Penal Code Ann. §§ 7.01, 7.02, 19.02, 19.03 (West 2021 and Cum. Supp. 2024). A death sentence, however, may be imposed only if "the defendant actually caused the death of the deceased[,] . . . intended to kill the deceased or . . . anticipated that a human life would be taken." Tex. Code Crim. Proc. Ann., Art. 37.071(2)(b)(2) (Vernon 2006); see also *Johnson* v. *State*, 853 S. W. 2d 527, 535 (Tex. Crim. App. 1992) (en banc) ("The Texas capital murder scheme does not allow an individual to be put to death for merely being a party to a murder"). To that end, the jury was required at the sentencing phase of Gutierrez's trial to answer whether Texas proved beyond a reasonable doubt that Gutierrez "actually caused" Harrison's death or, if not, that he "intended to kill [her]" or "anticipated that a human life would be taken." Art. 37.071(2)(b)(2). The jury answered yes, and Gutierrez was sentenced to death.

Gutierrez has long maintained that the police coerced him into confessing that he was in Harrison's home on the night of the murder. He insists that, as he twice told the police before the statement in which he purportedly confessed, he never entered the mobile home that night. Although Gutierrez never disputed that he and two accomplices planned to rob Harrison, he contends that he thought his accomplices would merely rob Harrison's empty mobile home and that no one would be harmed during the robbery. He accordingly asserts that he should never have been sentenced to death, and intends to seek vacatur of his death sentence in a state habeas petition. See Art. 11.071(5)(a)(3) (Vernon Cum. Supp. 2024).

Since 2010, Gutierrez has sought DNA testing of crime-scene evidence, including Harrison's nail scrapings, a loose hair, and various blood samples, to help him prove it was his accomplices, not Gutierrez, in Harrison's home on the night of her murder. He maintains that Texas's Article 64 entitles him to such DNA testing. Art. 64.01(a)(1). That law provides for DNA testing where a "convicted person establishes by a preponderance of the evidence" that he "would not have

been convicted if exculpatory results had been obtained through DNA testing" and that the request was "not made to unreasonably delay the execution of sentence or administration of justice." Art. 64.03(a)(2). To grant a motion for DNA testing under Article 64, the state court must also find, among other things, that the evidence "is in a condition making DNA testing possible" and that "identity was or is an issue in the case." Art. 64.03(a)(1).

Invoking Article 64, Gutierrez twice moved in state court for an order requiring the local district attorney to turn over the untested crime scene evidence for DNA testing. The trial court denied his first request in 2010, and the Texas Court of Criminal Appeals (TCCA) affirmed. *Ex parte Gutierrez*, 337 S. W. 3d 883, 886 (2011). The TCCA reasoned that, even if Gutierrez's DNA was not present on the tested items, that would not establish his innocence of Texas capital murder. *Id.*, at 899, 901. After all, even if he was not in the home, Gutierrez could still be a party to the robbery that eventually resulted in Harrison's death. *Id.*, at 901. And, as the TCCA saw it, Gutierrez could not invoke Article 64 to establish that he had been wrongly sentenced to death unless he could also establish his innocence of the underlying crime. *Ibid.* Finally, the court added: "[E]ven if [Article] 64 did apply to evidence that might affect the punishment stage as well as conviction," Gutierrez "still would not be entitled to testing" because "the record facts" show that "he played a major role in the underlying robbery and that his acts showed a reckless indifference to human life." *Ibid.*

Gutierrez tried again in 2019, this time bolstered by new counsel and new evidence that, according to Gutierrez, would implicate Harrison's nephew, Avel Cuellar, as one of the two people who stabbed Harrison to death. In the interim, Fermin Cuellar (Avel Cuellar's nephew), had signed a sworn statement averring that his uncle Avel approached him in the summer of 1998 about stealing "'a lot'" of money from Harrison. App. 701a. Fermin also averred that, after the

murder, Avel boasted to Fermin that he had money buried in the trailer park. Again, the Texas courts denied Gutierrez's motion. On appeal, the TCCA reiterated that DNA testing was not available to show ineligibility for the death penalty and that, "'even if [it were],'" Gutierrez "'still would not be entitled to testing.'" *Gutierrez* v. *State*, 2020 WL 918669, \*7–\*9 (Feb. 26, 2020) (*per curiam*).

B

Gutierrez next filed this federal action for declaratory and injunctive relief under 42 U. S. C. § 1983. He sued respondent Luis Saenz, the district attorney who has custody of the evidence Gutierrez would like tested and whose office prosecuted Gutierrez. Gutierrez's complaint alleges that, "[b]y refusing to release the biological evidence for testing, and thereby preventing [Gutierrez] from gaining access to exculpatory evidence that could have led to his acquittal [or] demonstrated that he is not death eligible," the district attorney "deprived" him "of his liberty interests in utilizing state [postconviction] procedures . . . in violation of his right to due process of law." App. 457a–458a.

Gutierrez's complaint pinpoints at least three features of Article 64 that prevented him from gaining access to the relevant evidence to which, he says, the Due Process Clause entitles him. First, Gutierrez says, the Texas courts interpret Article 64 to impose a virtually insurmountable barrier to obtaining DNA testing, deeming a prisoner ineligible as long as the record contains *any* evidence, no matter how minor, that he committed the crime. *Id.*, at 449a, 451a. Second, and relatedly, he asserts that it was unfair for the TCCA not to consider new evidence he had proffered since his trial: A fair procedure, he contends, would require considering the effect exculpatory DNA evidence would have on a jury that also heard "new evidence casting doubt on [Gutierrez's] statement" to the police. *Id.*, at 452a, n. 8. Third, Gutierrez asserts that, as interpreted by the TCCA, Article

64 violates the Due Process Clause by forbidding DNA testing when its sole purpose is to establish that a defendant is ineligible for the death penalty. *Id.*, at 456a.

The District Court agreed with Gutierrez in part. 565 F. Supp. 3d 892 (SD Tex. 2021). It is fundamentally unfair, the court declared, that Texas gives prisoners the right to file a habeas petition challenging their death sentence, but precludes them from obtaining DNA testing to support that habeas petition unless they can establish innocence of the underlying crime. *Id.*, at 911. That limitation renders the habeas right "illusory" because few people can make a clear showing that they were wrongly sentenced to death without DNA evidence. *Id.*, at 910–911. "Due process," the court explained, "does not countenance procedural sleight of hand whereby a state extends a right with one hand and then takes it away with another." *Id.*, at 911.

On appeal, a divided panel of the Fifth Circuit vacated the District Court's declaratory judgment, reasoning that Gutierrez's claimed injury was not redressable because the declaratory judgment would be unlikely to cause the prosecutor to "reverse course and allow testing." 93 F. 4th 267, 272 (2024). The court recognized that, just two years ago, this Court rejected a nearly identical argument in *Reed*, 598 U. S. 230. See 93 F. 4th, at 273–274, and n. 3. Yet the Fifth Circuit purported to distinguish *Reed* because, in Gutierrez's case, the TCCA "effectively anticipated an unfavorable federal court ruling" when it held that, even if Article 64 applied to claims affecting death eligibility, the facts in the trial record would still not entitle Gutierrez to DNA testing. 93 F. 4th, at 275. Judge Higginson dissented, noting that he saw no "meaningful distinction" between this case and *Reed*. 93 F. 4th, at 275.

While Gutierrez's request for rehearing was pending in the Fifth Circuit, Texas scheduled his execution. This Court stayed his execution and granted certiorari to consider Gutierrez's standing to bring his § 1983 claim. 603 U. S. 949

(2024). Because *Reed* plainly establishes that he does, the Court now reverses.

## II

### A

Individuals convicted of crimes in state court "have a liberty interest in demonstrating [their] innocence with new evidence under state law." *District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. 52, 68 (2009). For that reason, a state-created right to postconviction procedures can, "'in some circumstances, beget yet other rights to procedures essential to the realization of the parent right.'" *Ibid.*[1] To that end, this Court held in *Skinner* v. *Switzer*, 562 U. S. 521 (2011), that a Texas prisoner could file a due process claim under §1983 against a prosecutor who refused "'to release . . . biological evidence for testing.'" *Id.*, at 530. In that case, Skinner had alleged that the prosecutor's refusal to turn over evidence deprived him of "'his liberty interests in utilizing state procedures to obtain reversal of his conviction and/or to obtain a pardon or reduction of his sentence.'" *Ibid.* This Court reasoned that, while Skinner could not challenge in federal court the TCCA decisions denying his Article 64 motions, he could allege in a §1983 action that Article 64 unconstitutionally prevented him from obtaining such testing. *Id.*, at 532.

*Skinner* did not explicitly address a state prisoner's standing to bring a due process claim against the custodian of his

---

[1] One of the dissents contends that this Court "ha[d] no business intervening in this case in the first place" because "Gutierrez's suit rests on the premise that the Fourteenth Amendment's Due Process Clause gives him a 'liberty interest' in Texas's voluntarily created procedures." *Post*, at 322 (opinion of THOMAS, J.). Even if the merits of Gutierrez's due process claim were relevant to the standing question at issue here (they are not), *Osborne* squarely forecloses JUSTICE THOMAS's view of that claim. See 557 U. S., at 68; see also, *e. g.*, *Wolff* v. *McDonnell*, 418 U. S. 539, 558 (1974) ("[L]iberty," like property, is protected by the Constitution, "even when the liberty itself is a statutory creation of the State").

evidence. That question was first raised in *Reed*, where this Court confronted another claim that Texas's postconviction DNA testing law failed to guarantee procedural due process. 598 U. S., at 233. Rodney Reed alleged, among other things, that Article 64's "stringent chain-of-custody requirement was unconstitutional and in effect foreclosed DNA testing for individuals convicted before 'rules governing the State's handling and storage of evidence were put in place.'" *Ibid.* Before this Court, the local prosecutor argued that Reed lacked Article III standing. Specifically, the prosecutor asserted that a favorable court decision would not redress Reed's injury. That was because, in the prosecutor's view, a federal court's "declaration that the statutory provision [he] attack[s] is unconstitutional" would not "'likely'" cause the district attorney to turn over the physical evidence in his possession. Brief for Respondents 38–39; *Reed*, 598 U. S. 230; *California* v. *Texas*, 593 U. S. 659, 673 (2021).

This Court disagreed and held that Reed had established standing to pursue the declaratory judgment action. First, the Court explained, "Reed sufficiently alleged an injury in fact: denial of access to the requested evidence." 598 U. S., at 234. Second, "[t]he state prosecutor, who is the named defendant, denied access to the evidence and thereby caused Reed's injury." *Ibid.* Finally, the Court reasoned, "if a federal court concludes that Texas's post-conviction DNA testing procedures violate due process, that court order would eliminate the state prosecutor's justification for denying DNA testing" and thereby remove the barrier between Reed and the requested DNA testing. *Ibid.*

The same is true of Gutierrez's suit. Like Reed and Skinner, Gutierrez alleges that the local prosecutor's denial of his request for DNA testing deprived him of "his liberty interests in utilizing state procedures to obtain an acquittal and/ or reduction of his sentence, in violation of his right to due process of law." App. 458a. As in *Reed*, moreover, the declaratory judgment Gutierrez seeks would redress that in-

jury by "'order[ing] a change in [the] legal status'" of the parties and "eliminat[ing]" the state prosecutor's allegedly unlawful "justification for denying DNA testing." 598 U. S., at 234. That is sufficient to resolve this case.

## B

### 1

The Fifth Circuit recognized the clear parallels between this case and *Reed*. See 93 F. 4th, at 272, 274, n. 3. Nevertheless, the court thought that, unlike in *Reed*, the local prosecutor here was unlikely to allow testing even if a federal court "declare[d] Texas may not deny DNA testing that would affect only the punishment stage." 93 F. 4th, at 272. Because the TCCA already concluded Gutierrez would not be entitled to DNA testing even if Article 64 did apply to evidence affecting only the punishment stage, the Fifth Circuit reasoned that the district attorney would "quite likely" rely on that holding to deny testing again. *Id.*, at 274. Respondents, joined by the principal dissent, similarly urge that Gutierrez lacks standing because the District Court's reason for declaring part of Article 64 unconstitutional "was only one of several independent state-law grounds supporting District Attorney Saenz's decision to deny access to the requested evidence." Brief for Respondents 24; see also *post*, at 348–349 (opinion of ALITO, J.).

This attempt to distinguish *Reed* is wrong twice over. First, both respondents and the Fifth Circuit gloss over the substance of Gutierrez's complaint, which is the proper focus of the standing inquiry here. See *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 734 (2008). Gutierrez's complaint takes issue not just with Article 64's limitation to actual innocence claims, but with the barrier Article 64 erects between Gutierrez and DNA testing. At bottom, Gutierrez asserts that, to the extent Texas law precludes him from obtaining the requested evidence, it violates his rights under the Due Process Clause. App. 457a–458a. That is why his

complaint alleges, among other things, that Article 64 poses a "virtually impossible [standard] for anyone convicted under the law of parties to obtain DNA testing," *id.*, at 453a, and why he takes issue with the TCCA's refusal to consider "newly proffered evidence" in assessing claims like his own, *id.*, at 452a, n. 8.[2]  To the extent the Fifth Circuit based its assessment of redressability on the declaratory judgment the District Court later issued, rather than Gutierrez's complaint, it turned the Article III standing inquiry on its head. Gutierrez's "standing to bring this suit," 93 F. 4th, at 271, does not depend on the relief the District Court granted on the merits.

The principal dissent does not dispute that Gutierrez challenged, in his complaint, each of the roadblocks Article 64 placed between himself and DNA testing. *Post*, at 350 (opinion of ALITO, J.).  Instead, the dissent repeats the Fifth Circuit's error, urging that Gutierrez can now obtain only "reinstatement of the District Court's declaratory judgment." *Post*, at 347.  But rather than assert that the scope of the declaratory judgment retroactively deprived the District Court of jurisdiction over Gutierrez's complaint, as the Fifth Circuit erroneously held, the principal dissent suggests instead that "affirmance of the District Court's declaratory

---

[2] The principal dissent highlights the TCCA's rule "that only evidence in the trial record may be considered in determining whether post-conviction DNA testing is allowed."  *Post*, at 354 (opinion of ALITO, J.). That construction of Texas law is, of course, what Gutierrez has challenged under the Due Process Clause.  See *supra*, at 312.  In Gutierrez's view, that new evidence, together with the DNA testing, will help him establish that he did not in fact "anticipat[e] that a human life would be taken," Tex. Code Crim. Proc. Ann., Art. 37.071(2)(b)(2), and that his death sentence must therefore be vacated.  Contra, *post*, at 354 (ALITO, J., dissenting) (insisting that "a favorable decision on Gutierrez's constitutional argument would *not* bolster his challenge to his sentence").  That the principal dissent is skeptical about the merits of Gutierrez's due process challenge is not pertinent because the Court only granted certiorari to consider Gutierrez's Article III standing to bring his suit.  See *ibid.*

judgment" would not help Gutierrez moving forward. *Post*, at 350. That argument, however, does nothing to support the Fifth Circuit's holding, which the principal dissent defends, that Gutierrez lacked "standing to bring this suit." 93 F. 4th, at 271.[3]

2

Second, and more fundamentally, the Fifth Circuit erred in transforming the redressability inquiry into a guess as to whether a favorable court decision will in fact ultimately cause the prosecutor to turn over the evidence. *Id.*, at 274. In *Reed*, just like in this case, the Texas courts had proffered multiple reasons for denying Reed's Article 64 motion, including that "Reed did not demonstrate that he would have been acquitted if the DNA results were exculpatory," 598 U. S., at 233, and that Reed "failed to establish that his request [was] not made to unreasonably delay the execution of his sentence," *Reed* v. *State*, 541 S. W. 3d 759, 778 (Tex. Crim. App. 2017). The principal dissent claims that, for Reed, "striking down the chain-of-custody rule" would have "critically undermined the TCCA's holding" as to "[t]wenty-one additional items," which "could have been considered" if the declaratory judgment issued in his favor. *Post*, at 352. Yet

---

[3] As the principal dissent sees it, the Fifth Circuit held only that Gutierrez lacked standing to press one of his arguments in favor of Article 64's unconstitutionality: that "'the state violates due process by . . . preventing testing if resulting evidence would be relevant only to the sentence.'" *Post*, at 348, n. 7 (quoting 93 F. 4th, at 271). Even if that particular argument about Article 64's unlawfulness could be disentangled from the rest of Gutierrez's due process claim, see *supra*, at 312–313, 316, however, the dissent never embraces the Fifth Circuit's view that Gutierrez lacked "standing to bring this suit" in the District Court, 93 F. 4th, at 271. Instead, it suggests that Gutierrez lacked standing to seek "affirmance of th[at] claim" from the Fifth Circuit. *Post*, at 348, n. 7. It was the district attorney, not Gutierrez, who sought relief from the Fifth Circuit, and there is no reason to think the Courts of Appeals must dismiss a case for lack of standing simply because the nonappealing party did not cross-appeal the scope of the District Court's judgment.

even absent the chain-of-custody rule, Reed still faced the TCCA's assessment that his DNA testing request was "untimely," 541 S. W. 3d, at 778, and the trial court's determination that "exculpatory results from DNA testing of all the evidence he requested to be tested" would not establish his innocence, *id.*, at 773. This Court nevertheless reasoned in *Reed* that, "if a federal court concludes that Texas's post-conviction DNA testing procedures violate due process," that court order would redress his injury by "eliminat[ing]" the state prosecutor's reliance on Article 64 as a reason for denying DNA testing. 598 U. S., at 234. The particular declaratory judgment Reed requested was thus no more likely to yield a change in the district attorney's conduct than the one Gutierrez sought here. Contra, *post*, at 347, 351–354 (opinion of ALITO, J.).

What was true in *Reed* thus applies here, too. There is little doubt that Saenz considers Article 64 in his assessment of whether to provide requested DNA evidence. Indeed, Saenz confirmed at oral argument that he would likely "turn over the evidence" if he thought Article 64 entitled Gutierrez to DNA testing. Tr. of Oral Arg. 71. A declaratory judgment in Gutierrez's favor would accordingly redress his injury by removing the allegedly unconstitutional barrier Article 64 erected between Gutierrez and the requested testing.

To be sure, Saenz nevertheless states that any declaratory judgment will not affect his ultimate willingness to turn over the evidence. He and the principal dissent urge that the Court need not even "speculate" about what he might do because, "[a]fter securing a declaratory judgment from the district court," Gutierrez again sought DNA testing and "Saenz refused." Brief for Respondents 27; see *post*, at 350 (opinion of ALITO, J.). This, again, is a familiar refrain. The prosecutor in *Reed*, too, maintained that a declaratory judgment would not "'bring about'" "'any change in [his] conduct.'" Brief for Respondents 38–39; *Reed*, 598 U. S., at 249 (THOMAS, J., dissenting). This Court was unmoved by that

assertion. See *id.*, at 234. The reason is simple: That a prosecutor might eventually find another reason, grounded in Article 64 or elsewhere, to deny a prisoner's request for DNA testing does not vitiate his standing to argue that the cited reasons violated his rights under the Due Process Clause. See, *e. g., Federal Election Comm'n* v. *Akins*, 524 U. S. 11, 25 (1998) ("[T]hose adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground . . . even though the agency . . . might later, in the exercise of its lawful discretion, reach the same result for a different reason"); *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 572, n. 7 (1992) ("[U]nder our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered . . .").

C

Finally, Saenz asserts in the alternative that this case is now moot because Saenz refused Gutierrez's request for DNA testing even after the District Court issued the declaratory judgment. Brief for Respondents 42–44. That claim fails, too. As Saenz himself recognizes, "a case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Chafin* v. *Chafin*, 568 U. S. 165, 172 (2013) (quoting *Knox* v. *Service Employees*, 567 U. S. 298, 307 (2012)). It is not enough that "the practical impact of any decision is not assured." 568 U. S., at 175.

In any event, a procedural due process claim like the one Gutierrez presses is not mooted by the defendant's mid-appeal promise that, no matter the result of a lawsuit, the ultimate outcome will not change. Holding otherwise would

allow all manner of defendants to manufacture mootness by ensuring that, no matter what procedures a court requires the defendant to employ, the same substantive outcome will result. In that world, the person "living adjacent to the site for proposed construction of a federally licensed dam" would lose her claim "to challenge the licensing agency's failure to prepare an environmental impact statement" as long as the agency promised that the statement would not cause the license to be withheld or altered. *Lujan*, 504 U. S., at 572, n. 7. Article III mandates no such result.

\* \* \*

In the end, *Reed* is indistinguishable. Gutierrez has standing to challenge Texas's DNA testing procedures under the Due Process Clause. The judgment of the U. S. Court of Appeals for the Fifth Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BARRETT, concurring in part and concurring in the judgment.

When the Fifth Circuit attempted to distinguish this case from *Reed* v. *Goertz*, 598 U. S. 230 (2023), it failed to consider the breadth of the relief that Gutierrez requested in his complaint. See *ante*, at 316. I would reverse on that basis alone. The Court goes further, borrowing from our somewhat relaxed redressability inquiry in administrative-law procedural injury cases. See *ante*, at 318–320 (citing *Federal Election Comm'n* v. *Akins*, 524 U. S. 11, 25 (1998); *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 572, n. 7 (1992)). By invoking *Akins* and *Lujan* in the unique context of requests for DNA evidence from Texas prosecutors, the Court muddies the waters of standing doctrine. I respectfully join all but Part II–B–2 of the Court's opinion.

JUSTICE THOMAS, dissenting.

I join JUSTICE ALITO's principal dissent because I agree that Ruben Gutierrez lacks standing to bring a federal suit alleging that Texas's post-conviction DNA testing procedures violate due process.[1]   I write separately to emphasize that this Court has no business intervening in this case in the first place.   The Constitution does not require any State to establish procedures for state prisoners to challenge the validity of their convictions after trial.   Yet, Gutierrez's suit rests on the premise that the Fourteenth Amendment's Due Process Clause gives him a "liberty interest" in Texas's voluntarily created procedures.   That premise cannot be squared with any principled reading of the Due Process Clause.   I therefore disagree with our decision to grant certiorari and revive Gutierrez's challenge.   Our intervention serves no purpose other than to exacerbate the already egregious delays endemic to capital litigation.

I

A

The Texas Constitution provides capital defendants the right to a trial by jury.   Art. 1, §10.   It further provides that, after a defendant is convicted and sentenced, he may

---

[1] I agree that the Court "flagrantly distorts the standard" that this Court articulated in *Reed* v. *Goertz*, 598 U. S. 230 (2023), by deeming irrelevant the independent grounds that the Texas courts have given for denying DNA testing to Gutierrez.   *Post*, at 346–348 (ALITO, J., dissenting). I also continue to believe that *Reed* made "chaos" of our standing doctrine. 598 U. S., at 255 (THOMAS, J., dissenting).   Even if the Texas courts had not articulated alternative grounds for denying Gutierrez testing, "an abstract declaration" that Texas's limits on DNA testing are unconstitutional cannot redress any injury because it does not compel any "change in conduct" on the part of the district attorney.   *Id.*, at 249.   Gutierrez's real dispute is with the Texas courts for denying his motions for testing, but the *Rooker-Feldman* doctrine prohibits parties from attacking state-court judgments in federal district court.   See *Reed*, 598 U. S., at 244–252 (THOMAS, J., dissenting); *Rooker* v. *Fidelity Trust Co.*, 263 U. S. 413 (1923); *District of Columbia Court of Appeals* v. *Feldman*, 460 U. S. 462 (1983).

Thomas, J., dissenting

file a direct appeal to the Texas Court of Criminal Appeals (TCCA), the State's highest court for criminal cases. Art. 5, §5(b). Texas law also allows prisoners sentenced to death to challenge their conviction and sentence collaterally by filing a petition for habeas corpus in their court of conviction. Tex. Code Crim. Proc. Ann., Art. 11.071 (Vernon Cum. Supp. 2024). Even if the prisoner's trial was error free, he may obtain habeas relief under state law if he produces newly discovered evidence establishing that he is actually innocent of the offense. *Ex parte Mayhugh*, 512 S. W. 3d 285, 295 (Tex. Crim. App. 2016).

Chapter 64 of the Texas Code of Criminal Procedure further allows convicted defendants to seek testing of DNA evidence that was in the possession of the State during trial. Arts. 64.01(a)(2)(a–1), (b) (Vernon 2018). Upon the defendant's motion, the convicting court may order testing if certain conditions are met, including that the evidence still exists in a testable condition, that the defendant can show that he likely would not have been convicted had he obtained exculpatory results from DNA testing, and that the defendant can show that he is not bringing the motion unreasonably to delay his execution. Art. 64.03(a). Defendants who obtain DNA testing may use the results to support their state habeas petitions. *Thacker* v. *State*, 177 S. W. 3d 926, 927 (Tex. Crim. App. 2005) (*per curiam*).

B

A Texas jury convicted Gutierrez and sentenced him to death for the 1998 robbery and murder of Escolastica Harrison. Having thrice failed to obtain DNA testing under Chapter 64 in state court, he now claims that several of Chapter 64's restrictions on obtaining DNA testing violate the Due Process Clause of the Fourteenth Amendment. See *ante*, at 311–313.

To make sense of Gutierrez's claim, we must first understand what rights the Due Process Clause protects. The Clause provides that no State shall "deprive any person of

life, liberty, or property, without due process of law." Amdt. 14, § 1. In other words, the State cannot decide to take away an individual's life, liberty, or property unless it adheres to certain procedures. But, the Due Process Clause does not protect all rights—only life, liberty, and property. Thus, the first step in any due process analysis is to determine whether the right that the individual asserts falls within one of these three categories. See *Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564, 570–571 (1972). If it does not, the "requirements" of due process do not "apply." *Ibid.*

By seeking to execute Gutierrez and to imprison him until his execution, Texas undoubtedly seeks to deprive Gutierrez of his life and liberty. Yet, Gutierrez rightly does not base his due process claim on either of these deprivations, because he has received far more than the process required to justify them. Under our precedents, Texas must conduct a trial before it can imprison or execute a person as punishment for a crime. See *Herrera* v. *Collins*, 506 U. S. 390, 398–399 (1993). But, the "State is not required by the Federal Constitution to provide . . . a right to appellate review." *Griffin* v. *Illinois*, 351 U. S. 12, 18 (1956) (plurality opinion); accord, *id.*, at 21 (Frankfurter, J., concurring in judgment); *McKane* v. *Durston*, 153 U. S. 684, 687 (1894). Nor need it provide "[p]ostconviction relief," which "is even further removed from the criminal trial." *Pennsylvania* v. *Finley*, 481 U. S. 551, 556–557 (1987). Texas thus gave Gutierrez at his 1999 trial all the process necessary to imprison and execute him. The ensuing quarter century of direct and collateral review has been additional process above the constitutional floor.

Gutierrez instead asserts that he has a distinct " 'liberty interest' " in Texas's "state-created right to postconviction" relief. *Ante*, at 314. In Gutierrez's view, part of the "liberty" that Texas prisoners enjoy under the Fourteenth Amendment is a right to obtain release pursuant to Texas's habeas statute, which the State takes away every time its

THOMAS, J., dissenting

courts deny habeas relief. Thus, Gutierrez contends, if Texas law does not afford prisoners sufficient procedural rights to bolster their habeas petitions—such as, in his case, access to DNA testing—the State has deprived them of liberty without the due process of law.[2]

Gutierrez bases his asserted interest on this Court's decision in *District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. 52 (2009). There, the Court concluded that a prisoner has a "postconviction liberty interest" under the Due Process Clause if state law grants him "an entitlement . . . to prove his innocence even after a fair trial has proved otherwise." *Id.*, at 67–68.

## II

The Fourteenth Amendment does not protect Gutierrez's asserted "liberty interest." As originally understood, "liberty" in the Fourteenth Amendment likely referred only to freedom from physical restraint. It did not include entitle-

---

[2] Gutierrez also claims that executive clemency is a "liberty interest" that he cannot be denied without access to DNA testing. But, "noncapital defendants do not have a liberty interest in traditional state executive clemency." *District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. 52, 67 (2009); see *Connecticut Bd. of Pardons* v. *Dumschat*, 452 U. S. 458, 464 (1981). In *Ohio Adult Parole Authority* v. *Woodard*, 523 U. S. 272 (1998), Chief Justice Rehnquist concluded for a plurality of the Court that the same is true of capital defendants, because trial and sentencing extinguish the defendant's "interest in not being executed in accord with his sentence." *Id.*, at 281. When applying for clemency, the "defendant in effect accepts the *finality* of the death sentence for purposes of *adjudication*, and appeals for clemency as a matter of *grace*." *Id.*, at 282. Justice O'Connor, in contrast, left open the possibility that "some *minimal* procedural safeguards apply to clemency proceedings," such that a due process violation "might" occur if "a state official flipped a coin to determine whether to grant clemency." *Id.*, at 289 (opinion concurring in part and concurring in judgment). But, even if Justice O'Connor's view is correct, Gutierrez plainly cannot rely on it to establish a due process violation. DNA testing is not necessary to make the Texas clemency process less arbitrary than a coin flip.

ments to government-created benefits. This Court's contrary precedent stems from a conscious, policy-based rejection of the Due Process Clause's original meaning.

A

The original meaning of "liberty" in the Fourteenth Amendment was likely far narrower than our precedents currently hold. The term originally appears to have referred only to freedom from physical restraint. But, in the *Lochner* era, the Court began to hold that "liberty" includes fundamental rights generally. See *Lochner* v. *New York*, 198 U. S. 45 (1905). This Court has since adhered to that broader meaning.

As with any legal text, we must construe the Fourteenth Amendment according to the ordinary meaning of its terms at the time of its enactment. *Gibbons* v. *Ogden*, 9 Wheat. 1, 188–189 (1824); T. Cooley, Constitutional Limitations 55 (1868). We may not defer to "demonstrably erroneous" precedents that are inconsistent with the Amendment's original meaning. *Gamble* v. *United States*, 587 U. S. 678, 717–718 (2019) (Thomas, J., concurring).

When the Fourteenth Amendment was adopted in 1868, its Due Process Clause was understood to embody an "old . . . principle" dating back to Magna Carta, the great 13th-century charter of English liberties. *Munn* v. *Illinois*, 94 U. S. 113, 123–124 (1877). Magna Carta provided that a "free man" may not be "prosecute[d]," "imprisoned," or "destroyed" except "by the law of the land." Magna Carta, ch. 39 (1215), in A. Howard, Magna Carta: Text and Commentary 43 (1964). A century later, a statute interpreting this "law of the land" provision stated that "no Man" shall be "imprisoned" or "put to Death, without being brought in Answer by due Process of the Law." 28 Edw. III, c. 3 (1354); see also 1 E. Coke, The Second Part of the Institutes of the Laws of England 50 (1642) (interpreting "by the Law of the Land" to be equivalent to "by due Process of the Common law").

Thomas, J., dissenting

Blackstone referred to Magna Carta's "law of the land" provision as protecting the three "absolute rights of every Englishman": the "right of personal security," including "life"; "the right of personal liberty"; and "the right of private property." 1 W. Blackstone, Commentaries on the Laws of England 123, 125 (1765) (Blackstone). This formulation "heavily" influenced the founding generation of America. *Obergefell* v. *Hodges*, 576 U. S. 644, 724 (2015) (Thomas, J., dissenting). Many early state constitutions contained provisions "that replicated Magna Carta's language, but were modified to refer specifically to 'life, liberty, or property.'" *Ibid.*, and n. 3 (collecting examples). And, the Fifth Amendment similarly prohibited the Federal Government from depriving any person "of life, liberty, or property, without due process of law."

"Liberty" in the Fifth Amendment likely refers only to freedom from physical restraint. Blackstone defined "the right of personal liberty" as "the power of loco-motion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law." 1 Blackstone 130. Following Blackstone, "[s]tate decisions interpreting [state due process] provisions between the founding and the ratification of the Fourteenth Amendment almost uniformly construed the word 'liberty' to refer only to freedom from physical restraint." *Obergefell*, 576 U. S., at 724–725 (Thomas, J., dissenting) (citing C. Warren, The New "Liberty" Under the Fourteenth Amendment, 39 Harv. L. Rev. 431, 441–445 (1926) (Warren)). In light of this history, "it is hard to see how the 'liberty' protected by the [Fifth Amendment] could be interpreted to include anything broader." 576 U. S., at 725 (Thomas, J., dissenting).

"If the Fifth Amendment uses 'liberty' in this narrow sense, then the Fourteenth Amendment likely does as well." *Ibid.* When the language of a provision "is obviously transplanted from another legal source, it brings the old soil with it." *Taggart* v. *Lorenzen*, 587 U. S. 554, 560 (2019) (internal

quotation marks omitted). Applying that well-established principle, this Court has long recognized the Fourteenth Amendment's due process protections as having "the same sense" as the Fifth Amendment's. *Hurtado* v. *California*, 110 U. S. 516, 534–535 (1884); accord, *Slaughter-House Cases*, 16 Wall. 36, 80–81 (1873); *Hibben* v. *Smith*, 191 U. S. 310, 325 (1903); *Malinski* v. *New York*, 324 U. S. 401, 415 (1945) (opinion of Frankfurter, J.).[3]

It was not until the *Lochner* era that this Court adopted a broader understanding of "liberty." During that period, stretching from 1897 to 1937, this Court relied on the "legal fiction" of "substantive" due process to invalidate disfavored social and economic legislation by States. *McDonald* v. *Chicago*, 561 U. S. 742, 811 (2010) (Thomas, J., concurring in part and concurring in judgment). Under that fiction, the Due Process Clauses forbade *all* government infringement on "certain 'fundamental' liberty interests . . . , no matter what process is provided." *Reno* v. *Flores*, 507 U. S. 292, 302 (1993). To make the fiction work, the Court reinterpreted the Clauses' guarantee of "'process'" to encompass "substance," a notion that "strains credulity for even the most casual user of words." *McDonald*, 561 U. S., at 811 (opinion of Thomas, J.).

---

[3] Some decisions of this Court, while recognizing the general principle that the Fifth and Fourteenth Amendments' Due Process Clauses should be read together, have left open the possibility "that questions may arise in which different constructions and applications of [the Clauses] may be proper." *French* v. *Barber Asphalt Paving Co.*, 181 U. S. 324, 328 (1901). Even assuming that caveat is correct, however, reading "liberty" in the Fourteenth Amendment to mean fundamental rights generally, see *infra* this page and 329, would appear to render the Fourteenth Amendment so broad that it would destroy the general rule that the Fifth and Fourteenth Amendments should be read coextensively. And, even if "liberty" in the Fourteenth Amendment were entirely decoupled from its meaning in the Fifth Amendment, I am aware of nothing showing that the term was understood to encompass government entitlements before the 1970s. See *infra*, at 331–334.

THOMAS, J., dissenting

The Court's embrace of substantive due process also required it to jettison the concept of "liberty" as only freedom from restraint, so that it could encompass other rights that the Court deemed "fundamental." In *Allgeyer* v. *Louisiana*, 165 U. S. 578 (1897), this Court's first substantive due process decision under the Fourteenth Amendment, the Court for the first time broadened the definition of "liberty" to include the freedom of contract. *Id.*, at 589; see Warren 445–449 (tracing the interpretation of "liberty" from the Fourteenth Amendment's ratification to *Allgeyer*). By the height of the *Lochner* era, the Court had stretched the term to cover "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923). These privileges included "the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children," and "to worship God according to the dictates of his own conscience." *Ibid.*

This Court eventually repudiated *Lochner*'s muscular version of substantive due process—at least for economic rights. See *Ferguson* v. *Skrupa*, 372 U. S. 726, 730 (1963); *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379 (1937). But, the Court continues to treat *Meyer*'s definition of "liberty" as authoritative. *E. g., Roth*, 408 U. S., at 572.

B

Gutierrez's claim of a *state-created* "liberty interest" in obtaining post-conviction relief is inconsistent with the original understanding of "liberty." From the founding through the *Lochner* era, "liberty" was understood to be a natural, prepolitical right. Such an understanding is fundamentally incompatible with a "right" bestowed by the government.

Blackstone squarely framed life, liberty, and property as natural rights that existed before government. In an account "heavily influenced" by the political theories of John

Locke, *Obergefell*, 576 U. S., at 726–727, n. 4 (THOMAS, J., dissenting), Blackstone explained that, in the state of nature, every man has the "power of acting as [he] thinks fit, without any restraint or control." 1 Blackstone 121. When man "enters into society, [he] gives up a part of his natural liberty" to enjoy the rest of it in security. *Ibid.* Thus, the liberty that each man enjoys as "a member of society, is no other than natural liberty so far restrained by human laws . . . as is necessary and expedient for the general advantage of the publick." *Ibid.* This includes "the absolute rights" of life, liberty, and property, which exist in the "state of nature, and which every man is intitled to enjoy whether out of society or in it." *Id.*, at 119 (emphasis deleted). In other words, according to Blackstone, life, liberty, and property are rights that predate government and that were not surrendered when government was established; they are not entitlements that the government can bestow by positive law. Founding-era Americans shared this understanding of liberty. The Lockean "idea of civil liberty as natural liberty constrained by human law" "permeated the 18th-century political scene in America." *Obergefell*, 576 U. S., at 726–728 (THOMAS, J., dissenting). For instance, the Virginia Declaration of Rights of 1776—"the first of the colonial bills of rights," *Klopfer* v. *North Carolina*, 386 U. S. 213, 225 (1967)—proclaimed that "all men . . . by nature" possess the "inherent rights" of "life," "liberty," and "property," which they retain "when they enter into a state of society." § I, in 1 Milestone Documents in American History 154 (P. Finkelman ed. 2008) (Finkelman). Similarly, the Declaration of Independence asserts that the "unalienable Rights" of "Life, Liberty, and the pursuit of Happiness" come from the "Creator," and that, "to secure these rights, Governments are instituted among Men." ¶2.

The understanding of liberty as a natural right persisted until well after the enactment of the Fourteenth Amendment. Even as this Court expanded the notion of "liberty"

in the *Lochner* era, it remained faithful to the idea of liberty
as "individual freedom *from* governmental action, not as a
right *to* a particular governmental entitlement." *Oberge-
fell*, 576 U. S., at 726 (THOMAS, J., dissenting). None of the
liberties enumerated in *Meyer*, for instance, could be charac-
terized as state-created benefits. See 262 U. S., at 399. To
the contrary, when interpreting the Due Process Clauses, the
Court distinguished between rights inherent to the individ-
ual and privileges established by the government. The
Court recognized, for example, that a prisoner's statutory
entitlement to early release on parole was a "privilege" that
"comes as an act of grace to one convicted of a crime," not
a right protected by the Due Process Clauses. *Escoe* v.
*Zerbst*, 295 U. S. 490, 492–493 (1935).

In short, entitlements established by the government can-
not be "liberty" under the Due Process Clause of the Four-
teenth Amendment. Gutierrez thus has no "liberty inter-
est" in Texas's state-created right to post-conviction relief.

C

Gutierrez rests the legitimacy of his due process claim on
*Osborne*, which concluded that a prisoner has a " 'liberty in-
terest' " when state law gives him "an entitlement . . . to
prove his innocence even after a fair trial has proved other-
wise." 557 U. S., at 67. But, *Osborne* did not base this con-
clusion on the original meaning of "liberty" in the Four-
teenth Amendment. It instead relied on a line of cases
ultimately tracing back to *Goldberg* v. *Kelly*, 397 U. S. 254
(1970), where this Court relied on policy considerations to
redefine "property" to include government entitlements.

Scholars generally agree that the term "property" in the
Due Process Clauses originally referred only to those inter-
ests traditionally recognized as property at common law.
See, *e. g.*, 1 K. Hickman & R. Pierce, Administrative Law
§ 7.4, pp. 903–904 (7th ed. 2024); G. Lawson, Federal Adminis-
trative Law 350 (1998); L. Tribe, American Constitutional

Law § 10–8, pp. 680–681 (2d ed. 1988). Property at common law did not include entitlements to government benefits. See 2 Blackstone 16–19, 384–399; J. Kent, Commentaries on American Law 324–330, 613–614 (W. Browne ed. 1894) (Kent). And, consistent with their general view of civil liberties, Americans at the founding and in the early Republic viewed property—like liberty—as a natural, pre-political right. See, *e. g.*, Virginia Declaration of Rights, § I, in Finkelman 154; *Calder* v. *Bull*, 3 Dall. 386, 388–389 (1798) (opinion of Chase, J.); H. Baldwin, A General View of the Origin and Nature of the Constitution and Government of the United States 136 (1837); Kent 203.

The understanding of property as a natural right persisted through the ratification of the Fourteenth Amendment. After the Civil War, this Court held that a statute-of-limitations defense was not "property" within the meaning of the Constitution because it "is the creation of conventional law," not a "natural right." *Campbell* v. *Holt*, 115 U. S. 620, 629 (1885). And, state-court decisions in the years leading up to and immediately following the Amendment's ratification continued to recognize property as a natural right. See, *e. g.*, *People* v. *Quant*, 12 How. Pr. 83, 89 (NY Sup. Ct. 1855); *Sherman* v. *Buick*, 32 Cal. 241, 249 (1867); *Munn* v. *People*, 69 Ill. 80, 96 (1873), aff'd, 94 U. S. 113 (1877).

Consistent with this view, "it has traditionally been held" that the Due Process Clauses do not apply where it is "possible to characterize [the asserted] private interest . . . as a mere privilege subject to the [government's] plenary power." *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 895 (1961). Thus, from the antebellum period to the 1960s, this Court consistently recognized that government employment, veterans' benefits, admission to the country as an alien, and other government-created entitlements are not property or otherwise cognizable interests under the Due Process Clauses. See, *e. g.*, *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 542 (1950); *Oceanic Steam Nav.*

THOMAS, J., dissenting

*Co.* v. *Stranahan*, 214 U. S. 320, 340–343 (1909); *Buttfield* v. *Stranahan*, 192 U. S. 470, 497 (1904); *Taylor* v. *Beckham*, 178 U. S. 548, 576 (1900); *Crenshaw* v. *United States*, 134 U. S. 99, 104 (1890); *United States* v. *Teller*, 107 U. S. 64, 68 (1883); *Butler* v. *Pennsylvania*, 10 How. 402, 416 (1851); *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524, 592–593 (1838).

In the 1960s, Professor Charles Reich of the Yale Law School published two articles proposing a radical reinterpretation of the concept of property. See Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L. J. 1245 (1965) (Individual Rights); The New Property, 73 Yale L. J. 733 (1964) (The New Property). Taking direct aim at the Framers' understanding, Reich argued that "[p]roperty is not a natural right but a deliberate construction by society" that could be redefined to meet contemporary social needs. *Id.*, at 771. In his view, the rise of "the welfare state" and the dependence it fostered meant that "each man cannot be wholly the master of his own destiny." *Id.*, at 786. Thus, he concluded, to protect the now-dependent citizenry from arbitrary government power, the legal system must "mak[e government] benefits into rights" akin to traditional property rights. *Ibid.* In other words, "[w]e must create a new property." *Id.*, at 787.

This Court embraced Reich's vision in 1970, holding that "welfare benefits" are property under the Fourteenth Amendment's Due Process Clause because they "are a matter of statutory entitlement for persons qualified to receive them." *Goldberg*, 397 U. S., at 261–262. The Court dismissed any distinction between "a 'privilege' and . . . a 'right,'" and did not attempt to ground its conclusion in the text or history of the Due Process Clause. *Id.*, at 262 (some internal quotation marks omitted). The Court instead gave a sociological justification, "simply highlight[ing] the social importance of 'entitlements,' which had come to make up '[m]uch of the existing wealth in this country,' and which only the poor had been theretofore unable to effectively enforce."

*Williams* v. *Reed*, 604 U. S. 168, 182, n. (2025) (Thomas, J., dissenting); see *Goldberg*, 397 U. S., at 262, and n. 8 (citing Individual Rights 1255; The New Property).

Soon after *Goldberg*'s radical redefinition of "property" to include government-created entitlements, this Court redefined "liberty" along similar lines. The Court held that, in at least some circumstances, the denial of parole triggered the Due Process Clause because "a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State." *Wolff* v. *McDonnell*, 418 U. S. 539, 558 (1974); accord, *Meachum* v. *Fano*, 427 U. S. 215, 226 (1976). To justify this shift, the Court relied on "the accepted due process analysis as to property." *Wolff*, 418 U. S., at 557–558; accord, *Meachum*, 427 U. S., at 226 (citing *Goldberg*, 397 U. S. 254); see also *Evitts* v. *Lucey*, 469 U. S. 387, 400–401 (1985) (citing *Goldberg*, 397 U. S., at 262).

As with property, the Court's redefinition of "liberty" was a conscious break with the past. The Court rejected the inquiry of "whether [a] parolee's liberty is a 'right' or a 'privilege'" as "hardly useful *any longer*." *Morrissey* v. *Brewer*, 408 U. S. 471, 482 (1972) (emphasis added). It expressly repudiated its earlier case law holding that probation, as "an 'act of grace,'" triggers no due process protections. See *Gagnon* v. *Scarpelli*, 411 U. S. 778, 782, n. 4 (1973) (quoting *Escoe*, 295 U. S., at 492). And, seemingly to obfuscate the awkwardness of referring to a government-created entitlement as "liberty," the Court began to speak instead of "liberty interests." *Kenosha* v. *Bruno*, 412 U. S. 507, 515 (1973) (internal quotation marks omitted). Although it is now standard terminology in due process litigation, the phrase did not appear in the United States Reports before *Goldberg*.

*Osborne* relied on this line of cases to recognize a "liberty interest" in post-conviction procedures. Invoking the language of *Goldberg*, the Court asserted that a prisoner has a "liberty interest" in a State's post-conviction procedures if those procedures confer "an *entitlement* . . . to prove his

innocence" after trial. 557 U. S., at 67 (emphasis added). And, to establish that an entitlement of this kind can give rise to a viable due process claim, the Court cited *Connecticut Bd. of Pardons* v. *Dumschat*, 452 U. S. 458, 463 (1981), and *Wolff*, 418 U. S., at 556–558, both of which relied on this Court's post-*Goldberg* redefinition of "property."[4] See 557 U. S., at 68.

*Osborne* thus cannot support Gutierrez's asserted "liberty interest." We may, consistent with the judicial power, defer to earlier decisions that "apply traditional tools of construction and arrive at different," but reasonable, "interpretations of legal texts." *Gamble*, 587 U. S., at 721 (Thomas, J., concurring). But, *Osborne* rests on nothing more than *Goldberg*'s abandonment of the Due Process Clause's original meaning.

## III

We should correct the error we made in *Osborne*, which seriously undermines States' interests in finality and in providing relief to compelling claims of actual innocence. At the very least, we should cease finding novel ways to revive due process challenges to post-conviction DNA testing procedures, as the Court does today.

In enacting Chapter 64, Texas has voluntarily chosen to prioritize claims of actual innocence at a significant cost to its interest in finality. Thanks in no small part to decisions of this Court, capital cases today are routinely plagued by decades-long delays between sentencing and execution, with much of the litigation concerning convoluted procedural issues having little or nothing to do with the guilt or innocence of the defendant. See *Baze* v. *Rees*, 553 U. S. 35, 69–70

---

[4] *Wolff* invoked "the accepted due process analysis as to property" to hold that a "statutory right to good time" credits constituted a liberty interest. 418 U. S., at 557–558. *Dumschat* relied on *Wolff* and *Meachum* v. *Fano*, 427 U. S. 215, 226 (1976), to establish that a "'state-created right'" can be a cognizable liberty interest. 452 U. S., at 463. *Meachum* cited *Goldberg* for that point. 427 U. S., at 226.

(2008) (Alito, J., concurring); *id.*, at 92 (Scalia, J., concurring in judgment). This delay undermines the "important interest" that both "the State and the victims of crime have . . . in the timely enforcement of a sentence." *Hill* v. *McDonough*, 547 U. S. 573, 584 (2006). In spite of these interests, Texas has willingly decided to make freestanding actual-innocence claims cognizable on post-conviction review and to create a process for obtaining DNA testing to support such claims. In this respect, Texas is more generous to capital defendants than the Federal Government, which offers no statutory mechanism for raising a freestanding actual-innocence claim. See *Herrera*, 506 U. S., at 400.

By recognizing a "liberty interest" in Texas's post-conviction procedures, however, this Court has converted those procedures from a means of vindicating compelling claims of actual innocence into a tool for obstruction. In addition to trial, direct appeal, and multiple rounds of collateral review in state and federal court, Texas must now prevail in yet another arena—§ 1983 litigation challenging its DNA testing procedures—before it can carry out its lawfully imposed sentences. See Rev. Stat. § 1979, 42 U. S. C. § 1983. And, given the novelty of this litigation, such suits give rise to a host of difficult threshold justiciability questions that must be resolved before a federal court can reach the merits of the due process challenge, much less before a state court can resolve the prisoner's claim of actual innocence.

We need look no further than this case. Twenty-six years after the brutal murder of Escolastica Harrison, this Court stayed Gutierrez's impending execution. 603 U. S. 937 (2024). Why? *Not* because Gutierrez had made a compelling allegation of innocence. Rather, the Court stayed the execution to decide whether Gutierrez has standing to raise a due process challenge to Texas's post-conviction procedures. There is every reason to think that the ultimate claim of actual innocence on which Gutierrez's case rests is baseless. The key premise that Gutierrez hopes that DNA testing will

Thomas, J., dissenting

establish—that he was not inside Harrison's home when she was stabbed to death with a pair of screwdrivers—is contradicted by *his own confession*, to say nothing of the unanimous statements of his accomplices. See *post*, at 339–340 (ALITO, J., dissenting). The TCCA has held three times that Gutierrez would likely still have been convicted of capital murder as an accomplice even if he could prove that he had not personally been inside Harrison's home. See *post*, at 343–344. And, in Gutierrez's most recent motion for DNA testing, the trial court explicitly found that Gutierrez had made the motion "for the purpose of unreasonably delaying the execution of [his] sentence." App. 655a. In short, Texas could reasonably determine that the need for finality outweighed the upsides of giving Gutierrez additional process. Yet, because this Court has found a "liberty interest" where none exists, that judgment must be thwarted until this additional multiyear front of litigation reaches its conclusion. If this is what States can expect when they create new post-conviction avenues for raising actual-innocence claims, they may well conclude that doing so is not worth the cost.[5]

\* \* \*

Gutierrez's suit rests on a non-existent "liberty interest." The Due Process Clause protects an individual's natural liberty *from* government interference. It does not guarantee entitlements *to* government benefits, like Texas's voluntarily adopted post-conviction procedures. By intervening to revive this suit, the Court facilitates precisely the "unjustified

---

[5] Our two earlier cases addressing due process challenges to Texas's DNA testing procedures followed a similar pattern. In both cases, the Court intervened long after sentencing to address threshold procedural issues in the petitioners' federal due process suits. See *Reed*, 598 U. S., at 232–233 (addressing the timeliness of petitioner's due process suit 25 years after sentencing); *Skinner* v. *Switzer*, 562 U. S. 521, 525 (2011) (addressing the availability of §1983 as a cause of action 16 years after sentencing).

delay" that it is supposed to prevent in capital cases. *Buck-lew* v. *Precythe*, 587 U. S. 119, 150 (2019). That is a misuse of our discretionary certiorari jurisdiction. I respectfully dissent.

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, dissenting.

The Court and I agree on one thing: we should decide this case based on the test adopted in *Reed* v. *Goertz*, 598 U. S. 230, 234 (2023). After that, however, the majority veers sharply off course. First, it blatantly alters the *Reed* test. See *ante*, at 309, 315, 317. Second, it then has the audacity to criticize the Fifth Circuit for applying the real *Reed* test. See *ante*, at 316. Third, it ignores critical differences between the situation in *Reed* and the situation here. See *ante*, at 316–318. Fourth, it paints a misleading picture of underlying facts and Gutierrez's decades-long litigation campaign. See *ante*, at 309–314. Fifth, it fails to recognize the limited scope of the declaratory judgment at issue. See *ante*, at 316. And sixth, it ignores lawful and binding Texas law regarding the facts that may be considered when a prisoner seeks DNA testing. See *ante*, at 317.

## I

### A

#### 1

Because the majority paints a misleading picture of the facts and prior proceedings in this case, I begin by setting the record straight. In 1999, Gutierrez was convicted and sentenced to death for the brutal murder of Escolastica Harrison, an 85-year-old woman who lived in a mobile home park in Brownsville, Texas, with her nephew Avel Cuellar. See *Ex parte Gutierrez*, 337 S. W. 3d 883, 886 (Tex. Crim. App. 2011). As a result of his friendship with Cuellar, Gutierrez became acquainted with Harrison and occasionally ran errands for her. *Ibid.* Cuellar, Gutierrez, and other friends

gathered to drink behind Harrison's home—and Cuellar, while inebriated, revealed that Harrison kept her entire life savings (more than $600,000) in her home because she distrusted banks. See *Gutierrez* v. *Stephens*, 2013 WL 12092544, \*1 (SD Tex., Oct. 3, 2013); *Ex parte Gutierrez*, 337 S. W. 3d, at 886.

When Gutierrez heard this, he hatched a plan to break into the mobile home and steal the money. *Id.*, at 886. He recruited two accomplices—Rene Garcia and Pedro Gracia—and on September 5, 1998, the three men went to Harrison's trailer home to execute the plan. *Ibid.* By the time they left the scene, Harrison had been beaten and stabbed 13 times in her face and neck with two different instruments. See *id.*, at 887, and n. 2. When Cuellar came home that night, he reported discovering his elderly aunt's dead body face-down in a pool of blood. *Id.*, at 886.

Several witnesses told detectives that they had seen Gutierrez at the mobile home park on the day of the murder. *Ibid.*; see *Gutierrez* v. *Stephens*, No. 1:09–cv–00022 (SD Tex., July 30, 2012), ECF Doc. 23–96, pp. 22–23. Detectives visited Gutierrez's home but were told he was not there. *Ex parte Gutierrez*, 337 S. W. 3d, at 886. The next day, Gutierrez voluntarily appeared at the police station and made the first of three conflicting statements. *Ibid.* He told detectives that on the day of the murder, he was driving with a friend far away from the mobile home park. *Ibid.*; see 93 F. 4th 267, 269 (CA5 2024). This alibi fell through, however, when the friend told a conflicting story. *Ex parte Gutierrez*, 337 S. W. 3d, at 886. In addition, Garcia and Gracia confessed to involvement in the crime, named Gutierrez as an accomplice, and said he was inside the mobile home when Harrison was killed.[1] *Id.*, at 891; ECF Doc. 2–2, at 2. Based on these statements and other evidence, Gutierrez

[1] These statements were not admitted at trial. See *Ex parte Gutierrez*, 337 S. W. 3d, at 891.

was arrested. *Ex parte Gutierrez*, 337 S. W. 3d, at 887; ECF Doc. 2–2, at 2.

At the police station, Gutierrez agreed to give a second statement. *Id.*, at 2. Abandoning his earlier story, he admitted that he had planned to "'rip off'" Harrison, but he claimed that he had not wanted to murder her. *Ex parte Gutierrez*, 337 S. W. 3d, at 887. He told the police he had been waiting at a park when Garcia and Gracia carried out the scheme. *Ibid.* When they later met, he asserted, Garcia was holding a screwdriver covered in blood and said he had killed Harrison. *Ibid.*

The following day, Gutierrez gave his third conflicting statement. *Ibid.* In a signed confession, he said that Garcia was supposed to lure Harrison out of her home so that Gutierrez could enter through the back of the trailer and steal the money, but when Harrison saw Gutierrez enter her home, Garcia knocked her out and began to stab her with a screwdriver. *Ibid.* Gutierrez admitted that both he and Garcia were armed with screwdrivers during the robbery. *Gutierrez*, 2013 WL 12092544, *2. Gutierrez said that he took the money while Garcia was stabbing Harrison and that Gracia drove everyone away from the scene. *Ibid.* The State of Texas then charged Gutierrez with capital murder committed in the course of a robbery. *Ibid.*

2

Gutierrez moved to suppress his signed confession, arguing that it was coerced and that the police continued to question him after he had invoked his right to counsel and his right to remain silent. See *id.*, at *20. After conducting a hearing at which Gutierrez and two police officers testified, the judge denied the motion and issued detailed findings of fact.[2] *Ibid.*; see also ECF Doc. 23–66, at 47–125.

---

[2] After the hearing, the judge initially denied the suppression motion orally, but after Gutierrez appealed, the case was remanded, at the State's request, for the issuance of written findings. *Gutierrez*, 2013 WL

Gutierrez appealed, but the TCCA affirmed.   See *Gutierrez*, 2013 WL 12092544, *21.

3

At trial, the State's theory was that Gutierrez was guilty of murder either as a principal or a party to the crime.   *Ex parte Gutierrez*, 337 S. W. 3d, at 888.   The State relied on Texas's "law of parties," under which "[a] person is criminally responsible as a party to an offense if the offense is committed . . . by the conduct of another for which he is criminally responsible."   Tex. Penal Code Ann. §7.01(a) (West 2021).   Because Gutierrez had admitted to participating in the robbery, the State argued that he could be found guilty of murder even if he was not the one who delivered the fatal blows.   See ECF Doc. 23–102, at 69–70.

Gutierrez's defense offered a version of events that differed from all three of Gutierrez's prior stories.   The new account was that *Cuellar* had fatally stabbed Harrison.   *Gutierrez*, 2013 WL 12092544, *3.   The defense "intimated that the police had manufactured Gutierrez's statements" and criticized the police for conducting a shoddy investigation.   *Ibid.*   The jury found Gutierrez guilty.

At the penalty phase of the trial, the State presented evidence that Gutierrez had a long history of crime and violence, including burglaries, assault on a police officer, and threats to kill an assistant district attorney and a prison guard.   *Ibid.*   The jury found (1) that Gutierrez posed a "continuing threat to society," (2) that he had "intended to kill the deceased or . . . anticipated that a human life would be taken," and (3) that any mitigating circumstance were insufficient to warrant a sentence of life imprisonment without parole.   ECF Doc. 23–108, at 45–48; ECF Doc. 23–109, at 4–

12092544, *20–*21.   Gutierrez then took a second appeal, and the Texas Court of Criminal Appeals (TCCA) affirmed.   *Gutierrez* v. *Stephens*, No. 1:09–cv–00022 (Jan. 26, 2009), ECF Doc. 2–2, pp. 2–4; see *Gutierrez*, 2013 WL 12092544, *21.

5; see Tex. Code Crim. Proc. Ann., Art. 37.071, §§ 2(b), (e)(1) (Vernon 2006). Based on these findings, the judge imposed a sentence of death.

Gutierrez appealed and argued, among many other things, that his confession should have been suppressed, but the TCCA affirmed his conviction and sentence. See *Ex parte Gutierrez*, 337 S. W. 3d, at 888; ECF Doc. 19, at 58–60.

B

The end of direct appellate review was just the start of a new litigation saga spanning 23 years (and counting). After the conclusion of direct appellate review in 2002, Gutierrez filed multiple petitions for state and federal post-conviction relief, none of which has been successful. See 93 F. 4th, at 269–270. And Gutierrez has told us that he intends to file yet another petition for state post-conviction relief. See Brief for Petitioner 40–41.

Among the many claims that Gutierrez has advanced in post-trial litigation, the claim involved here—that he is entitled to DNA testing of items found at the murder scene—has a prominent place. At trial, however, his counsel declined to request DNA testing. *Ex parte Gutierrez*, 337 S. W. 3d, at 897. As recounted by the TCCA, "the record affirmatively shows that DNA testing was available to appellant before trial," but "defense counsel apparently did not have testing performed on those same items because of *sound trial strategy*." *Ibid.* (emphasis added). Instead of risking what testing might reveal, counsel "used the fact that the Brownsville Police Department failed to test the evidence containing biological DNA evidence to argue the lack of investigation and the existence of reasonable doubt during the trial." *Id.*, at 896. The lack of testing figured prominently in his cross-examination of prosecution witnesses and was repeatedly raised during summation. *Id.*, at 896–897, and n. 45.

The decision to forgo DNA testing at trial did not pay off, so after his conviction, Gutierrez changed course and demanded testing in post-conviction proceedings.  Chapter 64 of the Texas Code of Criminal Procedure governs such requests, and Gutierrez filed his first Chapter 64[3] motion in 2010.  See 93 F. 4th, at 269.  He sought testing of: (1) a blood sample taken from Harrison; (2) a blood-stained shirt belonging to Cuellar; (3) nail scrapings from Harrison; (4) blood samples collected from Cuellar's bathroom, from a raincoat located in or just outside Cuellar's bedroom, and from the sofa in the front room of the home; and (5) a loose hair recovered from Harrison's finger.  *Ex parte Gutierrez*, 337 S. W. 3d, at 888.  According to Gutierrez, the testing would show that he had not entered Harrison's house and would "support his position that he neither murdered Mrs. Harrison nor anticipated her murder."  *Ibid.*

The trial court denied this motion, and the TCCA affirmed. *Id.*, at 888–889, 901–902.  The TCCA explained that Chapter 64 authorizes post-conviction DNA testing only when the results would affect the applicant's conviction, not his sentence. *Id.*, at 899–901.  And in any event, it explained, favorable DNA results would not undermine the jury's guilty verdict because they would not "make it less probable" that Gutierrez planned and participated in the crime.  *Id.*, at 901.  Nor, it added, would such results affect Gutierrez's eligibility for the death penalty because "the record facts satisfy the *Enmund/Tison* culpability requirements that he played a major role in the underlying robbery and that his acts showed a reckless indifference to human life."  *Ibid.*[4]

_____

[3] The majority refers to this provision as "Article 64," but because the lower courts consistently refer to the provision as "Chapter 64" and the associated motions for DNA testing as "Chapter 64 motions," I use that terminology here.

[4] See *Enmund* v. *Florida*, 458 U. S. 782, 797 (1982); *Tison* v. *Arizona*, 481 U. S. 137, 157–158 (1987).

Gutierrez filed additional Chapter 64 motions for DNA testing in June 2019 and July 2021, but the trial court denied those motions, and each time the TCCA affirmed on the same grounds. *Gutierrez* v. *State*, 2020 WL 918669, \*6–\*9 (Feb. 26, 2020) (*per curiam*); App. 477a–479a.

C

This brings us to the latest chapter—Gutierrez's current suit. In September 2019, Gutierrez sued Cameron County District Attorney Luis Saenz and other Texas officials in federal court under Rev. Stat. § 1979, 42 U. S. C. § 1983. See Complaint in *Gutierrez* v. *Saenz*, No. 1:19–cv–00185 (SD Tex., Sept. 26, 2019), ECF Doc. 1. Gutierrez asserted several facial and as-applied constitutional challenges to Chapter 64, including a Fourteenth Amendment due process claim, a First Amendment access-to-courts claim, and an Eighth Amendment cruel-and-unusual-punishment claim. See *ibid.*

The District Court rejected almost all of Gutierrez's claims, but the court held that Chapter 64 is unconstitutional insofar as it allows a defendant to seek post-conviction DNA testing to challenge his *conviction* but not his *sentence*. 565 F. Supp. 3d 892, 910–911 (SD Tex. 2021). The District Court entered a partial declaratory judgment for Gutierrez on that ground but did not issue the injunction Gutierrez had sought. *Ibid.*; see 2020 WL 12771965, \*6 (SD Tex., June 2, 2020) (denying Gutierrez's request for a "preliminary and permanent injunction" requiring Saenz to turn over the requested evidence (internal quotation marks omitted)). The State appealed, but Gutierrez did not cross-appeal, so the only issue before the Fifth Circuit was whether Gutierrez was entitled to a declaratory judgment on the one constitutional claim accepted by the District Court.

The Fifth Circuit did not reach the merits of that claim because it held that Gutierrez lacked standing. Our test for Article III standing, set out in *Lujan* v. *Defenders of Wild-*

*life*, 504 U. S. 555, 560 (1992), has three prongs, and the Fifth Circuit found that Gutierrez failed the third prong—that is, the court found that Gutierrez could not show that his claimed injury (lack of DNA testing) was "'likely'" to be redressed by the relief that could at that point be awarded. See 93 F. 4th, at 275; *Lujan*, 504 U. S., at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" (internal quotation marks omitted)).

In *Reed* v. *Goertz*, this Court recently applied this test under related circumstances. As I will explain, there are critical differences between that case and the case at hand, but there are similarities that seem to have led the majority astray. In *Reed*, a prisoner sentenced to death (Rodney Reed) brought a § 1983 action against a district attorney and sought a declaratory judgment that *a particular provision* of Chapter 64 (its chain-of-custody provision, Tex. Code Crim. Proc. Ann., Art. 64.03(a)(1)(A)(ii) (Vernon 2018)) violates the Constitution. This Court held that *this declaratory judgment* would redress the prisoner's deprivation of DNA testing because it would "'substantially'" alter the likelihood of the district attorney's ordering DNA testing. *Reed*, 598 U. S., at 234.

There were multiple issues in *Reed*, and the Court's discussion of redressability was terse. In its entirety, it was as follows:

> "[I]f a federal court concludes that Texas's post-conviction DNA testing procedures violate due process, that court order would eliminate the state prosecutor's justification for denying DNA testing. It is '*substantially likely*' that the state prosecutor would abide by such a court order. In other words, in 'terms of our "standing" precedent, the courts would have ordered a change in a legal status,' and 'the practical consequence of that change would amount to *a significant increase in the likelihood*' that the state prosecutor would grant access

to the requested evidence and that Reed therefore 'would obtain relief that directly redresses the injury suffered.'" *Ibid.* (emphasis added; citation omitted).[5]

The Court held that the prisoner satisfied this test. In other words, the Court was persuaded that if he got the declaratory judgment he wanted, it was "substantially likely" that the district attorney would order testing.

The Fifth Circuit faithfully applied this test in its decision below, taking into account the particular facts of Gutierrez's case. It noted that the TCCA has repeatedly held that Gutierrez would still be responsible for the murder under the law of parties and would still be death-penalty eligible even if DNA testing provided the results he wanted. 93 F. 4th, at 272–273, 275. And it thus held that a decision in Gutierrez's favor on his constitutional claim would *not* make it substantially likely that the district attorney would release the items for testing.[6] *Id.*, at 275.

Today's decision, in contrast, flagrantly distorts the standard that *Reed* articulated. Indeed, the majority edits *Reed*'s critical language in a way that would draw rebuke if done by an attorney in a brief filed in this Court. *Reed*'s full discussion of redressability was quoted above. It consists of three sentences. The majority's analysis is based entirely on the first sentence, which states: "'[I]f a federal court concludes that Texas's post-conviction DNA testing procedures

———————

[5] Reed advanced the theory that the Court adopted. His brief said that "the question here is whether declaratory relief is likely to stop Goertz from relying on the CCA's unconstitutional interpretation of Article 64 to continue denying DNA testing. The answer is yes." Reply Brief in *Reed* v. *Goertz*, O. T. 2022, No. 21–442, p. 6.

[6] The Fifth Circuit's assessment of the likely effect of the declaratory judgment that Gutierrez sought was borne out when the TCCA affirmed the denial of Gutierrez's third motion for DNA testing in June 2024—after he had obtained the favorable declaratory judgment in the District Court. See App. 467a–468a.

violate due process,' that court order would redress [a prisoner's] injury by 'eliminat[ing]' the state prosecutor's reliance on Article 64 as a reason for denying DNA testing." See *ante*, at 319 (quoting *Reed*, 598 U. S., at 234). The second and third sentences explain why the conclusion drawn in the first sentence was true in Reed's case: because the particular declaratory judgment that Reed sought (striking down Chapter 64's chain-of-custody requirement) would "substantially" increase the likelihood that the district attorney would turn over the requested items for DNA testing. *Id.*, at 234. But the majority pretends those sentences do not exist.

This distortion is bad enough, but to make matters worse, the majority then criticizes the Fifth Circuit for "transforming the redressability inquiry into a guess as to whether a favorable court decision will in fact ultimately cause the prosecutor to turn over the evidence." *Ante*, at 318 (citing 93 F. 4th, at 274). In the majority's view, this Court apparently should not consider whether the District Court's judgment is likely to result in Gutierrez obtaining relief, but whether the District Court's judgment removes just one of the numerous "barrier[s] . . . between Gutierrez and the requested testing." *Ante*, at 319. The majority's new test makes a hash of redressability. It appears that, under this new test, the likelihood of redress is simply not relevant. That most certainly is not what *Reed* held.

Under the real *Reed* test, a plaintiff like Gutierrez must show that a favorable decision on his constitutional claim is "'substantially likely'" to prompt the district attorney to allow DNA testing. 598 U. S., at 234. And in this case, unlike in *Reed*, it is clear that the only relief that Gutierrez is in a position to seek—reinstatement of the District Court's declaratory judgment—is most unlikely to cause respondent Saenz to order DNA testing. That is the conclusion that the Fifth Circuit reached after carefully considering the relevant

facts, and that court was right.   The following part of this
opinion will explain why.[7]

## II

### A

The Texas courts have provided three reasons why Gutier-
rez is not entitled to the testing he seeks.   Any one of these,
if sound, would justify the denial of testing.

First, both the trial court and the TCCA have held that
Gutierrez is not entitled to post-conviction DNA testing be-
cause such testing is unavailable under Chapter 64 to show
ineligibility for the death penalty, and Gutierrez could not
show by a preponderance of the evidence that he would not
have been convicted if he obtained favorable DNA test re-
sults.   See *Ex parte Gutierrez*, 337 S. W. 3d, at 899–901;

---

[7] According to the majority, the Fifth Circuit held that "Gutierrez lacked
'standing to bring this suit,'" and it therefore concluded that Gutierrez
lacked standing to assert *any* of the claims he originally brought.   See
*ante*, at 318.   But just a few paragraphs after the part of the opinion
in which the language quoted by the majority appears, the opinion makes it
clear that its standing analysis focused on the one claim that was before
it.   See 93 F. 4th 267, 271 (2024).   That claim, the opinion noted, was that
"the state violates due process by permitting testing only if the evidence
could establish the prisoner would not have been convicted, thereby pre-
venting testing if resulting evidence would be relevant only to the sen-
tence."   *Ibid.*   It then set out respondents' standing argument: "The de-
fendants allege that Gutierrez has no standing to make *that* claim."   *Ibid.*
(emphasis added).   Thus, the Fifth Circuit's opinion is best understood as
holding only that affirmance of the claim that respondents appealed—that
Chapter 64 violates due process by barring defendants from seeking post-
conviction DNA testing to establish innocence of the death penalty—
would not redress Gutierrez's injury.   And in any event, the redressability
inquiry *had* to be limited in that way because Gutierrez did not cross-
appeal the District Court's rejection of his other claims.

Attempting to evade the cross-appeal rule, the majority characterizes
this case as one in which an appellee merely wishes to defend a judgment
whose "scope" did not reach the entirety of his claim.   *Ante*, at 318, n. 3.
But the District Court did not simply fail to award Gutierrez complete
relief on the one claim on which he prevailed.   Rather, it entered judg-
ment *against* him on different claims.

*Gutierrez*, 2020 WL 918669, \*5–\*8. Second, both the trial court and the TCCA have concluded that even favorable DNA test results would not help Gutierrez because he would still be responsible for the murder and would still satisfy the *Enmund/Tison* Eighth Amendment requirements. See *Ex parte Gutierrez*, 337 S. W. 3d, at 901; *Gutierrez*, 2020 WL 918669, \*8. Third, the trial court found that Gutierrez's application for DNA testing was made for the purpose of delay. See *id.*, at \*5. This finding of fact was not addressed by the TCCA. See *id.*, at \*9.

Contrary to the majority's suggestion, a favorable declaratory judgment respecting the first of these reasons (Chapter 64 does not allow post-conviction DNA testing to prove ineligibility for the death penalty) would not remove "*the . . .* barrier Article 64 erected between Gutierrez and the requested testing"; it would remove *a* barrier. *Ante*, at 319 (emphasis added). The District Court's declaratory judgment regarding the constitutionality of Chapter 64's limited grounds for post-conviction DNA testing, even if upheld by the Fifth Circuit and this Court, would affect only that reason and not the other two. And even if the TCCA did not accept the trial court's finding that Gutierrez filed his Chapter 64 motion for the purpose of delay, the TCCA would almost certainly adhere to its prior decisions holding that favorable DNA results would not show that Gutierrez was innocent of the crime or ineligible for the death penalty. As a result, the only relief Gutierrez can possibly get in this case would not result in court-ordered testing unless the TCCA reverses course in an utterly unforeseeable way.

Gutierrez argues, however, that even if the declaratory judgment would not lead *the Texas courts* to grant DNA testing, respondent Saenz would still have discretion to turn over the items and might do so. See Brief for Petitioner 37–38. But Gutierrez does not spell out *why* Saenz might do that. His argument is based on rank speculation, and that is not enough to support redressability. See *Lujan*, 504 U. S., at 561.

Furthermore, nothing in the record suggests that there is *any* likelihood that Saenz would do what Gutierrez wants. The declaratory judgment would not require Saenz to order testing. And he would know that the testing would be pointless because even if the items were tested and revealed what Gutierrez hopes for, the Texas courts would not disturb his conviction or sentence.

Not only is there no reason to think that Saenz—for some unknown reason—might nevertheless order DNA testing, but his conduct to date strongly suggests the opposite. Even after the District Court issued its declaratory judgment, he refused to order testing. And Gutierrez cannot explain why Saenz has steadfastly declined to allow testing ever since. If he had any inclination to allow testing, he could have done that at any point during this litigation—for example, when Gutierrez filed his petition, when this Court granted review, at any point during the briefing process, before or after argument, or yesterday. Not only has he not done so, he has steadfastly maintained that he *will not* do so. His position is that this case should be dismissed!

Unable to explain why affirmance of the District Court's declaratory judgment might change Saenz's mind, the majority contends that a favorable decision on *other constitutional claims* asserted in Gutierrez's complaint might do the trick. And it criticizes the Fifth Circuit for "bas[ing] its assessment of redressability on the declaratory judgment the District Court later issued, rather than Gutierrez's complaint." *Ante*, at 317.

This reasoning is fundamentally wrong and, if allowed to stand, will corrupt our Article III case law. Our standing requirements "persist throughout all stages of litigation." *Hollingsworth* v. *Perry*, 570 U. S. 693, 705 (2013). "That means that standing 'must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance.'" *Ibid.* (quoting *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 64 (1997)). The con-

ALITO, J., dissenting

stitutional claims on which the majority relies were rejected by the District Court, and Gutierrez did not appeal that part of the judgment. As a result, the best relief that Gutierrez could now obtain in this case is an affirmance of the District Court's declaratory judgment—and for the reasons already discussed, that relief would not make DNA testing substantially likely.

For all these the reasons, Gutierrez cannot satisfy *Reed*'s real test for redressability.

B

The majority treats this case as indistinguishable from *Reed*, but that is not correct. An examination of the situation in that case provides a clear explanation for the *Reed* Court's conclusion that its test for redressability was met. And once that is understood, it is clear that the present case is different.

1

Rodney Reed was convicted and sentenced to death for the murder of Stacey Lee Stites, whose body was found partially clothed and abandoned near a back country road. *Reed* v. *State*, 541 S. W. 3d 759, 762 (Tex. Crim. App. 2017). Based on an examination of her body, the police concluded that she had been sexually assaulted and strangled with a belt found at the scene. *Ibid.* DNA found on semen in Stites's body matched Reed's genetic profile, and Reed was subsequently arrested and charged with her murder. See *id.*, at 763. At trial, Reed argued (among other things) that he and Stites were in a romantic relationship, that they had engaged in consensual intercourse, and that the real culprit was Stites's fiance, Jimmy Fennell. *Ex parte Reed*, 271 S. W. 3d 698, 710 (Tex. Crim. App. 2008). The jury was not persuaded, and Reed was convicted of capital murder and sentenced to death. *Id.*, at 712.

Reed filed a Chapter 64 motion seeking DNA testing of the belt and more than 35 other items that were found either

on Stites's body, at the scene of the crime, or in or near the truck she shared with Fennell. *Reed*, 541 S. W. 3d, at 764–765. Applying Chapter 64, the TCCA ruled out consideration of evidence that fell into either of two categories. See *id.*, at 773. First, the TCCA refused to consider 21 items on the ground that they did not satisfy Chapter 64's chain-of-custody requirement.[8] *Id.*, at 769–770. Among these were the strap and buckle from the belt with which Stites had apparently been strangled. *Id.*, at 769. Second, the TCCA excluded other items on the ground that they were not reasonably likely to contain biological material suitable for testing. *Id.*, at 772. Eight items remained for the TCCA to consider, and five of them were found in or near the truck, not at the crime scene. *Id.*, at 774–775. The court then found that favorable results with respect to these eight items would not have shown by a preponderance of the evidence that Reed was not guilty. *Id.*, at 773–777.

2

Once the role that the chain-of-custody rule played in the TCCA's analysis is understood, the support for this Court's redressability finding in *Reed* is easy to understand. The declaratory judgment that Reed sought—striking down the chain-of-custody rule—would have critically undermined the TCCA's holding with respect to the potential impact of DNA testing. Twenty-one additional items, including the belt, could have been considered. If Fennell's DNA, but not Reed's, had been detected on the belt and perhaps other items found at the scene, that would have provided significant support for Reed's theory that Fennell was the murderer. As a result, the declaratory judgment might well have led to a state-court decision ordering DNA testing, and that possibility would have given the district attorney a reason to turn over the items even before such a state-court

---

[8] See Tex. Code Crim. Proc. Ann., Art. 64.03(a)(1)(A)(ii).

ALITO, J., dissenting

decision was handed down.   The result would have been "*a significant increase in the likelihood* that the state prosecutor would grant access to the requested evidence."   *Reed*, 598 U. S., at 234 (emphasis added; internal quotation marks omitted).

In response, the majority argues that even if the chain of custody rule were held to be unconstitutional, the district attorney could have denied Reed's request for another reason.   *Ante*, at 318–319.   That is true but beside the point.   Under this Court's decision in *Reed*, all that was required to show redressability was "a significant increase in the likelihood" that the district attorney would allow testing.

C

Gutierrez's case presents a far different situation.   Here, the TCCA has held that, even if DNA testing failed to detect Gutierrez's DNA *and* detected the presence of Cuellar's DNA, Gutierrez could not establish that he was not guilty of murder or that he is ineligible for a death sentence.   The TCCA noted that, since Cuellar lived with Harrison in the same trailer home and was the person who found her dead body, detecting his DNA on many items in the house would not necessarily be incriminating.   See *Gutierrez*, 2020 WL 918669, *7–*8.   And more important, even if Cuellar's DNA was detected on the most important items, such as the material found under Harrison's fingernails, that would be of little value to Gutierrez.   It would suggest that Cuellar was one of the individuals who stabbed Harrison—but that would not affect Gutierrez's culpability or his sentence.   Whether the fatal blows were administered by Garcia, Gracia, Cuellar, or some combination of these men, Gutierrez would still be guilty of murder under the law of parties because he participated in the scheme.   See Tex. Penal Code Ann. § 7.01(a).   And because he had reason to know that the execution of his scheme could well result in the loss of life, he would still be eligible for the death penalty.   See *Enmund* v. *Florida*, 458

U. S. 782, 797 (1982); *Tison* v. *Arizona*, 481 U. S. 137, 157–158 (1987). Thus, a favorable decision on Gutierrez's constitutional argument would *not* bolster his challenge to his sentence.

Gutierrez responds that favorable DNA results might change the TCCA's thinking because that court's holding on the effect of DNA evidence did not take into account newly discovered evidence that he wants to introduce. See Brief for Petitioner 38–42. The majority suggests that, in assessing whether Gutierrez's injury of not receiving DNA testing is redressable, the Fifth Circuit should have considered Gutierrez's assertion in his complaint that favorable DNA results *along with* the new evidence could render him ineligible for the death penalty. See *ante*, at 317. But the TCCA has held that only evidence in the trial record may be considered in determining whether post-conviction DNA testing is allowed. See *Holberg* v. *State*, 425 S. W. 3d 282, 285 (Tex. Crim. App. 2014) ("[T]his Court will not consider post-trial evidence when deciding whether or not the appellant has carried her burden to establish by a preponderance of the evidence that she would not have been convicted had exculpatory results been obtained through DNA testing.").[9] We have no basis for disregarding that limitation here. We are, of course, bound by the TCCA's interpretation of Texas law, and no question regarding the constitutionality of this feature of Texas law is now before us.[10]

------

[9] A similar limitation applies in federal habeas proceedings. See *Cullen* v. *Pinholster*, 563 U. S. 170, 181 (2011) (holding that habeas review of a state-court conviction pursuant to 28 U. S. C. §2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits").

[10] This is so for three reasons. First, if Gutierrez wanted to challenge those parts of the District Court's judgment, he needed to file a cross-appeal, but he did not do so. See, *e. g.*, *Northwest Airlines, Inc.* v. *County of Kent*, 510 U. S. 355, 364 (1994) (collecting cases). Second, the constitutionality of this provision is not within the question on which we granted

ALITO, J., dissenting

Not only does the majority's redressability analysis take into account evidence that this binding state-law rule excludes, but the majority seems to think it is relevant that "Gutierrez has long maintained that the police coerced him into confessing that he was in Harrison's home on the night of the murder." *Ante*, at 310.

The majority does not see fit to mention that the state courts have definitively rejected Gutierrez's argument that the confession was coerced, that Texas law would almost certainly bar him from raising the same claim again in a post-conviction proceeding,[11] and that the federal habeas statute would likewise bar consideration of the claim.[12]

\*   \*   \*

This decision's only practical effect will be to aid and abet Gutierrez's efforts to run out the clock on the execution of

--------

certiorari. And third, the question was not briefed or argued by the parties.

[11] See Tex. Code Crim. Proc. Ann., Art. 11.071, §§ 5(a)(1)–(a)(3) (Vernon Cum. Supp. 2024) (providing that a defendant can only file a second habeas petition challenging his death sentence if "the current claims and issues have not been and could not have been presented previously," no rational juror would have found the defendant guilty but for a constitutional violation, or no rational juror would have answered one or more of the special issues in the State's favor but for a constitutional violation); *Ex parte Blue*, 230 S. W. 3d 151, 161 (Tex. Crim. App. 2007) (noting that a state habeas applicant can only succeed on his claim under Art. 11.071, § 5(a)(3), in the "rare" case when "constitutional error . . . so permeated the State's evidence relevant to one of the special issues upon which it carries the burden of proof that, absent the error, it is *practically inconceivable* that any rational juror would actually answer the special issues in a way that mandates the death penalty" (emphasis added)).

[12] Because a claim regarding the admissibility of Gutierrez's confession would constitute an attack on his conviction, it cannot be raised in a suit under § 1983. See *Heck* v. *Humphrey*, 512 U. S. 477, 486–487 (1994). And any attempt to raise the issue in a federal habeas petition would almost certainly fail. See 28 U. S. C. §§ 2244(b)(2), 2254(d).

his sentence. And if the decision is taken seriously as a
precedent on Article III standing, it will do serious damage.
I therefore dissent.

Page Proof Pending Publication

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None